UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TEXAS EASTERN TRANSMISSION, LP** | **CIVIL ACTION** |
| **VERSUS** | **NO. 05-5731** |
| **CENTURY EXPLORATION NEW ORLEANS, INC. ET AL** | **SECTION "L" (4)** |

## ORDER AND REASONS

Pending before the Court are two Motions for Summary Judgment: (1) Defendant Parker Drilling Offshore USA, L.L.C.'s ("Parker") Motion for Summary Judgment on its cross claim against Defendant Century Exploration New Orleans, Inc. ("Century") (Rec. Doc. No. 37) and (2) Third Party Defendant Fugro Chance, Inc.'s ("Fugro Chance") Motion for Summary Judgment against Century (Rec. Doc. No. 45) on Century's third party claim. For the following reasons, Parker's Motion is GRANTED and Fugro Chance's Motion is DENIED.

**I. Factual and Procedural Background**

This case concerns alleged damage that occurred due to the improper positioning of a drilling vessel over a pipeline. Plaintiff Texas Eastern Transmission, LP's ("Texas Eastern") pipeline is located in Breton Sound, in the Gulf of Mexico off the coast of Louisiana. In its complaint, Texas Eastern states that sometime in November or December 2004,[1] Parker's drilling vessel, 25j, was moved into a location directly over its pipeline, the rig was jacked into position and drilling operations commenced. At the time, the vessel 25j was performing drilling

---

[1] In a memorandum in response to these two Motions, Texas Eastern estimates the date at late October or early November. (Pl.'s Mem. in Resp. to Mots. Summ. J. at 2.)

and exploration services for Century. Texas Eastern claims that it was not informed by Century that the 25j vessel had been set up directly over its pipeline until December 17, 2004, shortly before the vessel was to depart from its location. Though a major accident was avoided, Texas Eastern states that the pipeline had to be pulled from service for inspection and precautionary measures had to be taken, including the removal of explosive hydrocarbons from the pipeline, before the 25j vessel could be removed from its position and the pipeline could safely return to production.

On November 21, 2005, Texas Eastern filed the instant complaint against Century, Parker, and Gulf Ocean Services, Inc. ("Gulf Ocean"), a company providing surveying services to Century. Texas Eastern claims that it sustained over $1 million in damages resulting from inspection and repair costs, monitoring expenses, increased costs and expenses, and lost production and/or revenue. It consequently seeks recovery of damages on theories of negligence, breach of agreement to maintain safe distance from the pipeline, statutory violations and unseaworthiness of the vessel.

In response, Century filed counter, cross and third party claims against Texas Eastern, Gulf Ocean and Fugro-Chance, the company it hired to maneuver the vessel 25j into the drilling location and jack it into position. Century claims that Texas Eastern incorrectly reported the location of the pipeline and also incorrectly indicated that the pipeline was not in use. Records available to the oil and gas industry and public reflected this incorrect information, upon which Century relied. Century also contends that though Fugro-Chance conducted a sonar survey of the water bottom, it failed to detect the pipeline or note that it was not where reports indicated it to be located. Century states that though the pipeline, vessel and personnel suffered no physical damage or injuries, it sustained damages of over $600,000 due to the need to evacuate and

remove the vessel from service.

Additionally, Parker filed a cross claim against Century, contending that its contract with Century provides for indemnity and defense for any damages its 25j vessel caused at or within the drill site area. Parker states that Century refuses to provide the contractually-required indemnity or defense.

## II.  Motion for Summary Judgment Standard

A district court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material if it "might affect the outcome of the suit under governing law[.]" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  When considering a motion for summary judgment, the Court must review the facts "drawing inferences in a manner most favorable to the nonmoving party." *See General Universal Systems, Inc. v. Lee*, 379 F.3d 131, 137 (5th Cir. 2004).  A moving party must demonstrate an absence of genuine issues of material fact, meaning "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the party moving for summary judgment demonstrates such absence, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Willis v. Roche Biomedical Laboratories, Inc.*, 61 F.3d 313, 315 (5th Cir. 1995).

## III.     Parker's Motion for Summary Judgment on Indemnity and Defense

In order to determine whether Parker's claim for defense and indemnity holds merit, the Court examines the relevant contract language.  The Domestic Daywork Drilling Contract - Offshore (the "Contract") governs the parties rights and duties as between each other.  The

relevant language that Parker cites in support provides as follows:

> Section 606: Drilling Site and Access
>
> Operator [Century] will be responsible for providing access to the drilling site, as well as selecting, marking, and clearing drilling locations, for providing proper and sufficient certificates, including, without limitation, the Certificate of Financial Responsibility required pursuant to the OCS Lands Act as amended, permits or permission necessary to enter upon and operate on the drilling site, and for notifying Contractor [Parker] of any impediments or hazards to operations at each drilling location or within the anchor pattern, including any pipelines, cables, boulders, mud filled depressions or faulty bottom conditions in the area. Operator will also provide Contractor with soil and sea bottom condition surveys at each drilling location hereunder adequate to satisfy Contractor's Marine Surveyor.
>
> Notwithstanding any other provision of this Contract, *should there be obstructions at or within the area of the drill site*, including the anchor pattern, or faulty bottom conditions and these obstructions or faulty bottom conditions damage Contractor's items, *or Contractor's items damage these obstructions*, or if seabed conditions prove unsatisfactory to properly support or moor the Drilling Unit during operations hereunder, *Operator will be responsible for and hold harmless and indemnify Contractor for all resulting damage*, including payment of Standby Rate during required repairs, but Operator will receive credit for any physical damage insurance proceeds received by the Contractor as a result of any such damage to the Drilling Unit.

(Contract, Ex. 1 to Def.'s Mot. Summ. J., § 606) (emphasis added).

The parties do not dispute that Century abided by the first paragraph of this section, by selecting the drilling location, having a survey of the water bottom conducted, and obtaining the requisite permit to commence drilling. However, Parker asserts that Century is not in compliance with the second paragraph, as Century refuses to indemnify and defend it, though the "all resulting damage" language contained in the paragraph encompasses the damages claimed by Texas Eastern.

Conversely, Century argues that the damages alleged by Texas Eastern are not damages that the parties intended to be covered through the second paragraph language. The damages for

which indemnification and defense are contractually-required pursuant to this paragraph include only physical damage. In this case, as the rig did not touch the pipeline, neither the pipeline nor the rig suffered physical damage. Century concedes that some damage to the concrete coating surrounding the pipeline may be apparent, but it denies that the rig caused this damage. It contends that another party or object caused damage to the concrete coating as the pipeline has been in service since 1968.[2] Century asserts that, in any event, the expenses of restoring the concrete covering amount to $14,398.64 and virtually all of the remaining expenses and damages, $927,796.58, concern bleeding pressure from the pipeline, which does not relate to physical damage.

**Applicable Law and Analysis**

The Contract at issue is a maritime contract and thus general maritime law applies. *See Hoda v. Rowan Companies, Inc.*, 419 F.3d 379 (5th Cir. 2005); *Demette v. Falcon Drilling Co., Inc.*, 280 F.3d 492, 497 (5th Cir. 2002). When interpreting a maritime contract, a court must employ the general rules of contract construction and interpretation. *Consol. Grain & Barge Co., Inc. v. Capital Marine Supply, Inc.*, No. 99-0813, 2001 WL 823737, at * 3 (E.D. La. July 19,2001). "Each provision of a contract must be read in light of the other provisions so as to give each the meaning reflected by the contract as a whole." *Id*. "Finally, each provision of a contract must be given a meaning which renders it, along with all other provisions, effective rather than meaningless." *Id*.

The Court finds that the plain reading of the language in the second paragraph does not

---

[2]In its memorandum responding to the two Motions currently pending, Texas Eastern states that the physical scarring to the cement protective cover could have been caused by moving the 25j vessel into location, by drilling activities from the rig or from activities of other drilling vessels. (Pl.'s Mem. in Resp. to Mots. Summ. J. at 4.)

limit Century's obligation to indemnify and defend Parker only to instances where physical damage occurs. The contract is worded to provide that if any obstructions at or within the drilling site area exist and Parker's items cause damage to such obstruction, Century will indemnify and defend Parker for "*all* resulting damage" (emphasis added). Had the parties intended to limit Century's duty to cases where purely physical damage occurs, they would have drafted such language in the contract. This determination is supported by the fact that the parties did indeed include specific language relating to "physical damage" in the clause that follows the general indemnity and defense obligation for "all resulting damage." The parties stipulate that Century's defense and indemnity obligations will be reduced by the amount of any physical damage insurance proceeds that Parker receives. As the rules of contract construction provide that each provision must be read in light of all other provisions, the Court finds that the parties contemplated the duty to indemnify is not limited to those situations where purely physical damage arises. Moreover, this interpretation will not render any of the clauses meaningless.

At oral argument, Century, in support of its argument, pointed to another provision within the Contract concerning "Consequential Damages." That provision states that "[n]either party shall be liable to the other for special, indirect or consequential damages resulting from or arising out of this Contract, including without limitation, loss of profit or business interruptions including loss or delay of production, however same may be caused." (Contract § 909.) However, as pointed out by Parker's counsel, that paragraph relates to absolving the parties from liability for damages that they may cause to *each other* and does not relate to damages a contracting party may cause to a third person. The section that follows, titled "Indemnity Obligations," reinforces this view as it clarifies that the Section 606 language "be responsible for and hold harmless and indemnify" means that "the indemnifying party shall release, indemnify,

hold harmless and defend...the indemnified party from and against any and all claims...of any person or persons...." (*Id.* at § 910.)  Furthermore, Section 910 recognizes the inherent risks in the type of work contemplated by the Contract and states that Section 606 and 607 "exclusively govern the allocation of risks and liabilities" of the parties.  (*Id.* at § 911) (Section 607 deals with state and local tax liability).

Accordingly, for the reasons stated above, Century owes a duty to defend and indemnify Parker, and thus Parker's Motion for Summary Judgment is GRANTED.

**IV.   Fugro Chance's Motion for Summary Judgment**

As previously stated, Century filed a third party claim against Fugro Chance, alleging that Fugro Chance was negligent when it failed to correctly locate the pipeline and consequently failed to correctly jack up the rig.  In response, Fugro Chance filed this Motion for Summary Judgment, contending that evidence in the record soundly refutes Century's allegations.

**Applicable Law and Analysis**

"To establish maritime negligence, a plaintiff must demonstrate that there was a duty owed by the defendant to the plaintiff, a breach of that duty, an injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury."  *Canal Barge Co., Inc. V. Torch Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000) (quoting *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991)) (internal quotations omitted).  Maritime negligence is only actionable "if it is a legal cause of the plaintiff's injuries."  *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649 (5th Cir. 1992).  "[L]egal cause is something more than 'but for' causation, and the negligence must be a 'substantial factor' in the injury."  *Thomas v. Express Boat Co.,* 759 F.2d 444, 448 (5th Cir.1985).

Fugro Chance argues that Century's claim lacks any factual basis.  Fugro Chance asserts

that Century hired and relied on Gulf Ocean to locate the pipeline in relation to the proposed drilling location. However, Gulf Ocean did not report the correct location. Fugro Chance further avers that Century declined its offer to conduct an additional survey to verify the location of the pipeline, instead relying on the incorrect shallow hazard survey performed by Gulf Ocean and instructing Fugro Chance to conduct a sonar survey of the area while moving the rig into place. According to Fugro Chance, the sonar used to conduct this survey was only capable of detecting a pipeline on or above the sea floor, a fact of which Century was well aware. As the pipeline was buried underground, it remained undetected by the sonar equipment. The sonar equipment indicated that the sea floor was flat and smooth, and the contours of the pipeline could not be seen through any relief features on the sea floor. Fugro Chance contends that facts thus demonstrate that it properly performed the work for which it was hired by Century, and Century's allegation of negligence lacks any factual basis.

Century disputes Fugro Chance's recounting of the alleged facts and argues that genuine issues of material fact remain in contention, preventing summary judgment from being granted. First, Century argues that Fugro Chance was advised of the presence of the pipeline and chose to use its own information regarding the pipeline's location rather than the magnetometer survey performed by Gulf Ocean. Fugro Chance contests Century's allegations that it ignored the Gulf Ocean survey. It responds that its established procedure calls for review of databases to confirm the absence of pipelines in the immediate vicinity of a proposed drilling site. In this case, their database indicated a location over 100 feet from the drilling site, in accordance with the information provided by Gulf Ocean.

Second, Century argues that Fugro Chance had equipment at its disposal which could locate the pipeline below the seabed surface, but chose not to use it. In response, Fugro Chance

states that it did in fact offer to conduct a magnetometer survey of the area with this equipment, as it was concerned with the accuracy of the Gulf Ocean survey because it was performed before Hurricane Ivan struck the Gulf.  Fugro Chance was concerned that the pipeline became dislodged from its location due to the storm.  However, Century declined its offer to conduct the magnetometer survey, and Fugro Chance was under no obligation to disregard Century's specific instructions and perform work that had not been requested and for which it would not be compensated.

Third, Century avers that an operations report generated by Fugro Chance reveals that Fugro Chance was aware that the rig crossed the pipeline, but continued to lower the jack's legs.  Fugro Chance responds that Century misreads the report.  The log at issue indicates that the pipeline was crossed, however it was referring to crossing the pipeline at the location where it was reported to be.  Fugro Chance contends that it had no knowledge of the actual location of the pipeline and certainly did not intentionally place the rig on top of the pipeline.

Lastly, Century asserts that Fugro Chance's argument presumes that it placed the rig in the proper location.  Either the rig or the pipeline was positioned in the wrong location.  Although Century believes that the latter is the case, Texas Eastern and Gulf Ocean have taken the former position, and thus this is a material factual issue which must be resolved at trial.

Taking these factual arguments into consideration, the Court determines that summary judgment is not appropriate at this time.  Though the "mere existence" of a factual dispute will not otherwise defeat an appropriate order granting summary judgment, in this case, material facts are disputed and could affect the outcome of the case.  *See Anderson*, 477 U.S. at 247-48.  The facts in contention are not "irrelevant or unnecessary."  *Id.* at 248.  These facts must be resolved in accordance with the substantive law regarding maritime negligence and are therefore material.

*See id.* at 247.  Fugro Chance's knowledge of pipeline location, whether it had a duty to use advanced sonar equipment, whether it disregarded a third party's survey, etc. are critical to determination of this case.  *See id.*  As such, genuine issues of material fact remain to be resolved.  Consequently, the Court cannot conclude that the moving party is entitled to summary judgment in this instance.  *See Willis,* 61 F.3d at 315.

## V.  Conclusion

Accordingly, Parker's Motion for Summary Judgment is hereby GRANTED, and Fugro Chance's Motion for Summary Judgment is DENIED.

New Orleans, Louisiana, this  28th  day of November, 2006.

_____
UNITED STATES DISTRICT JUDGE